Exhibit 15

# Exhibit 15

## LABOR RELATIONS CONNECTION

| | |
|---|---|
| In the matter of:<br><br>TEAMSTERS LOCAL 25,<br><br>   and<br><br>ENCORE BOSTON HARBOR. | LRC Case No. 240-23<br>Charles Truong - Termination<br><br>Before:<br>Neutral Arbitrator Sarah Kerr Garraty |

## ENCORE BOSTON HARBOR'S POST-HEARING BRIEF

## INTRODUCTION

Encore Boston Harbor ("Encore") had just cause to terminate the grievant Charles Truong ("Truong") on March 17, 2023, because Truong used a racist slur when he referred to his Black colleague as a "monkey." *See* Company Exhibit ("CX") 10 (Encore Termination Reasons). There is no legitimate confusion about the racist nature of dehumanization of a Black colleague by referring to them as a "monkey." Truong's various and self-serving excuses for his conduct do not undermine Encore's just cause for his termination.

On February 18, 2023, Truong referred to his colleague ███████████ ("██████"), a Black man and another member of the Union, as a "monkey" in the presence of ██████ and several other colleagues. *See* Joint Exhibit ("JX") 7 (Truong Statement), 8 (Portillo Statement), and 9 (██████ Statement); and CX 5 (DiGaetano Statement). ██████ was understandably offended and surprised. *See* JX 9. Portillo ("Portillo"), another member of the Union, reported Truong's conduct to Charlene DiGaetano ("DiGaetano"), Truong's supervisor. *See* JX 8. DiGaetano, whose desk was located near Truong's, also overheard the racist characterization of ██████ and was shocked. *See* CX 5. DiGaetano brought the incident to her manager's attention when her manager Yelena Gobovets ("Gobovets") returned to work on February 21, 2023.

**REDACTED**

Gobovets, consistent with Encore policies and procedures, brought the incident to Employee Relations for investigation.  *See* CX 2 at 5 (Preventing Harassment Policy).  Upon investigation, Employee Relations found Truong referred to ███ as a "monkey" in the context of questioning whether ███ would honor a debt to Truong if he lost their wager.  *See* CX 10. Truong provided various inconsistent and incredible excuses for his conduct, and Truong did not apologize.  *Id*.  Rather, Truong doubled down on his racist slur by offering ███ a bunch of bananas immediately after Truong was placed on a suspension pending investigation for calling ███ a "monkey."  *Id*.

Encore is justified in having no tolerance for racist conduct.  Article 28 of the collective bargaining agreement ("CBA") between Encore and Teamsters Local 25 ("the Union") states that there is zero tolerance for harassment, including abusive or threatening language, or workplace violence and that "engaging in such conduct ***will be subject to discipline including immediate discharge***."  *See* JX 1 (CBA) (emphasis added).  Contrary to the concept of progressive discipline articulated in Article 17, the parties agreed in Article 28 that harassment in the workplace could lead to "immediate termination."  Despite the fact that the Union agreed in Article 28 that conduct like that at issue here warrants termination, it offered up Truong's baseless excuses and belabored the grammar and syntax of witness statements in a fruitless attempt to manufacture an issue of fact where there was none.  This tactic flies in the face of the CBA, which set forth the Union's and Encore's shared commitment that there will be no discrimination or harassment in the workplace.  *Id*

For the reasons set forth in greater detail herein, the grievance must be denied.

**REDACTED**

<u>**FACTS**</u>

## I.  THE COLLECTIVE BARGAINING AGREEMENT AND ENCORE POLICIES

### A.  *The Collective Bargaining Agreement Prohibits Discrimination and Harassment on the Basis of Race*

Encore and the Union were parties to the CBA.  In relevant part, with respect to

discrimination, the CBA provides:

> The employer and the Union agree that there shall be no discrimination as to wages, hours or working conditions against any employee on account of race, color, creed, national origin, disability, religion, veteran status, sex, sexual orientation, union status or activity, age or any protected status as provided by law.

*See* JX 1 at Article 27.

> With respect to harassment, in relevant part, the CBA further provides:

> Harassment and workplace violence will not be tolerated.  Individuals engaging in such conduct will be subject to discipline including immediate discharge. Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile work environment, workplace violence and sexual harassment.

*Id*. at Article 28.

### B.  *Encore's Preventing Harassment and Discrimination Policy, Code of Business Ethics, and Personal Conduct Policy*

Encore's Preventing Harassment and Discrimination Policy is applicable to all

employees.  *See* CX 2.  In relevant part, the policy provides:

> People work together better, and are more productive, when they are treated respectfully and feel comfortable in the workplace.  Harassment and discrimination are unacceptable.  We are committed to creating a respectful, courteous work environment free of unlawful discrimination and harassment of any kind.  The Company does not tolerate sexual or other unlawful harassment or discrimination by any employee, volunteer, vendor, contractor, consultant, agent, guest, customer, or visitor.  Harassment and discrimination are breaches of Company policy, and may be violations of state and/or federal law.  In addition to any disciplinary action that the Company may take, up to and including termination, offenders may also be personally liable for any legal and monetary damages.

3

**REDACTED**

*Id.* at 1.  The policy defines "harassment" as "unwelcome conduct, as determined by the recipient of the harassing behavior, whether verbal, physical or visual, that is based upon a person's Protected Characteristic."  *Id*. at 2.

Moreover, Encore maintains a Code of Business Conduct and Ethics, which Truong received and signed on May 29, 2019.  *See* JX 4 (Code of Business Conduct).  The Code of Conduct provides: "The Company does not tolerate offensive, demeaning, insulting or otherwise derogatory conduct, and is committed to a workplace that is free from sexual harassment and harassment based on other legally protected characteristics, or any other basis protected by federal, state or local law or ordinance or regulation."  *Id*. at 5.  With respect to the prohibition against Harassment and Discrimination, the Code of Ethics further provides:

> Employees who violate this policy will be subject to disciplinary action, up to and including termination of employment.  Disciplinary action can be taken in cases of inappropriate conduct, even if that conduct does not amount to a violation of the law.

*Id*.

Encore also maintains a Personal Conduct Policy applicable to all employees.  *See* CX 1 (Personal Conduct Policy).  In relevant part, the policy provides that "personal conduct standards are based on the philosophy that **people should be treated with dignity and respect**."  *Id*. at 1 (emphasis in original).  Examples of expected conduct set forth in the policy include: "Creating a positive work environment by respecting, helping, and encouraging coworkers;" and "Refraining from inappropriate conduct," with a reference to the Preventing Harassment and Discrimination Policy setting forth additional detail with respect to appropriate workplace behavior.  *Id*.

### C.     *Encore's Preventing Harassment and Discrimination Training*

Encore requires employees to attend, and Truong did attend, the Preventing Harassment and Discrimination orientation training.  The training sets forth Encore's prohibition against

305610136v.9

**REDACTED**

discrimination, harassment, and retaliation and trains employees on "[h]ow to avoid these behaviors and foster a culture of respect and dignity." *See* CX 4 (Preventing Harassment and Discrimination Training). **The training explicitly provides that referring to a Black person as a "monkey" is offensive and is an example of harassment and discrimination**. *Id.* at 8 (emphasis added).

### D.    *Encore Can Immediately Terminate Employees For Harassment*

Article 19 of the CBA reserves to Encore the right "to establish and administer reasonable rules, regulations and procedures governing the conduct of employees upon notification to the Union, provided that such rules, regulations and procedures are not inconsistent with any provisions of this Agreement." *See* JX 1.  Article 17 states that "[e]mployees may be discharged, suspended, or disciplined by the Employer for just cause" and "[t]he parties agree that the policy of progressive discipline shall be used in all cases where warranted[.]" *Id*.  With respect to egregious matters, the progressive discipline provision of the CBA provides:

> Employees may be discharged, suspended, or disciplined by Employer for just cause.  The parties agree that the policy of progressive discipline shall be used in all cases where warranted *but egregious matters may result in suspension pending investigation (SPI) or termination with no prior discipline*.

*Id*. (emphasis added).  Consistent with the CBA, Encore maintains a progressive discipline policy, which provides that harassment and discrimination are among the serious offenses that may result in immediate termination.  *See* CX 3 (Encore Progressive Discipline/Performance Policy).  However, in Article 28, the parties agreed that "violations of the preventing harassment and discrimination policy . . . will not be tolerated" and could lead to "immediate termination." *See* JX 1 at Article 28.

5

**REDACTED**

Article 20 provides the grievance and arbitration procedure.  *Id*.  The "arbitrator shall be bound by the terms of this Collective Bargaining Agreement and shall have no right in any way to modify or revise it."  *Id*.

## II.   TRUONG'S EMPLOYMENT WITH ENCORE

On June 3, 2019, Encore hired Truong as a Room Reservation Agent in the Call Center.  This was a sales role in which Truong engaged with Encore customers via phone regarding bookings and reservations.  Truong's workstation was located in a cubicle alongside his colleagues.  *See* CX 5 (which includes a diagram).  At all times relevant to this matter, Truong was an employee and member of the Union, and DiGaetano was his direct supervisor.

## III.   TRUONG REFERS TO ███████ AS A "MONKEY"

It is undisputed that, on February 18, 2023, while at his workstation, Truong said, in direct reference to and in the presence of ██████ "The monkey better pay."[1]  *See* JX 9, *see also* JX 8.

To the extent that context may be deemed relevant, Truong's dehumanizing reference to ██████ as a "monkey" was further compounded by the context, which was to publicly doubt whether ██████ would honor his debt if he lost their wager, which further degraded ██████'s integrity.  At the time of the comment, Truong and ██████ were working at either end of a compact row of four cubicles, with their colleague Portillo in between them.  Truong and ██████ who both regularly had high sales numbers, were making personal wagers and engaging in competitive banter with respect to who would win the interoffice competition for the highest sales numbers that month.  Truong and ██████ had engaged in similar wagers and banter in the

---

[1] Some witnesses reported slight variations on the wording of the comment (e.g., "as long as the monkey pays me" or "oh, don't worry monkey's going to pay me"); but without meaningful distinctions.

6

**REDACTED**

past, including, on one occasion, a wager that resulted in ▬ buying colleagues a round of drinks and another occasion in which they wagered a pack of cigarettes.  As Truong and ▬ bantered in the Call Center, Truong directed the offensive comment about ▬ to Portillo and, at about the same time as the comment, ▬ received a customer call on his headset.[2]

DiGaetano overheard Truong call ▬ a "monkey."  DiGaetano was shocked and offended by Truong's conduct, which had a particular impact on her as a member of a bi-racial family.  On the same day, Portillo approached DiGaetano about Truong's conduct.  *See* JX 8; CX 5 and CX 8.  This was the first time in her experience as a manager that DiGaetano observed discriminatory or harassing conduct of this type, and DiGaetano decided to wait to take any action until she could consult with her manager Gobovets, who was out of the office until February 21, 2023.  On the morning on February 21, 2023, DiGaetano consulted with Gobovets, who advised DiGaetano to speak with Truong and place a note in his file to document their conversation.  Given the nature of the conduct, Gobovets understood that she had to bring the incident to the attention of Employee Relations for further review, irrespective of Truong and DiGaetano's conversation.  See CX 2 at 5.

▬ did not speak to management on February 18, 2023, but did speak with his family about this experience over his "weekend," Sunday February 19, 2023, and Monday February 20, 2023.  When ▬ returned to work on February 21, 2023, just after their morning meeting, ▬ spoke with DiGaetano.  During that conversation, DiGaetano shared with ▬ that someone had brought Truong's conduct to her attention and that she would have to report it.[3]

---

[2] The Union sought to discredit DiGaetano by quibbling over whether (essentially due to her sentence structure) she had accurately described the way in which Truong made the offensive comment to Portillo while directing the comment at ▬  DiGaetano provided credible testimony with no meaningful inconsistencies.

[3] While both ▬ and DiGaetano recall that it was the other who initiated the conversation, they provide meaningfully consistent accounts of this conversation.  Who initiated the conversation is not relevant to the wrongfulness of the underlying conduct or Encore's just cause to terminate.

**REDACTED**

DiGaetano followed up with ███ after this conversation to tell him that Truong had not taken accountability for his conduct when DiGaetano spoke to him.

At the hearing, ███ explained that nothing like this had ever happened to him before in the workplace.  ███ was surprised by Truong's conduct, particularly because they had been told the standards for workplace conduct at Encore and because of his race and the racist history of the use of the word "monkey." ███ recalled that, at the time Truong made the offensive comment, a quiet came over the workplace. ███ took the customer call and did not further engage with Truong about the offensive comment. ███ exercised restraint by maintaining his professionalism in the shocking situation.  He posited that, if he had reacted differently, he may have lost his job as well and that he needed to lead by example by not reacting emotionally.

███ made clear that his measured response in the moment did not change the fact that this should not have been said, it was not right, and it was hurtful. ███ commented that, after the incident, he became aware of others putting words in his mouth in an attempt to falsely claim that he was "okay" with what had taken place.  At the hearing, ███ clarified that Truong's conduct was not okay with him and expressed his frustration that he had not received more support from the Union after experiencing racist conduct in the workplace.

## IV.   TRUONG SPEAKS WITH ██████ ON FEBRUARY 21 AND 22, 2023 AND DOES NOT APOLOGIZE

Both Truong and ███ returned to work on February 21, 2023, after having been out since February 18, 2023, when Truong used the racist slur.  On February 21, 2023, after they had each spoken with DiGaetano, Truong and ███ had a brief interaction, during which Truong did not apologize.[4]  On February 22, 2023, Truong was informed that he would be placed on

___

[4] At the hearing, ███ stated that he had "no memory" of Truong apologizing to him during this or any other conversation, and further reiterated several times that Truong did not apologize, which is consistent with ███'s account provided to Encore's Employee Relations on March 1, 2023, *see* CX 8 (ER Witness Interview Notes)

**REDACTED**

Suspension Pending Investigation.  *See* JX 5 (Suspension Pending Investigation).  Thereafter, he

had an opportunity to clean out his desk, at which time he had another interaction with ███████

which was captured on the surveillance video that was reviewed during the hearing.  The video

shows:

- Truong taking a bunch of bananas out of his desk;

- Truong approaching the garbage can as if to throw them away, but then turning to walk towards ██████ (while passing other individuals);

- Truong singling out ██████ by offering the bananas exclusively to ██████

- ██████ indicating that he did not want the bananas; and

- Truong throwing the bananas away without offering them to any of the many other colleagues in close proximity.

Truong singling out ██████ with a bunch of bananas in front of their colleagues, when Truong

had just been suspended for calling ██████ a "monkey," was a brazen doubling down on his

denigration of ██████ by furthering the dehumanizing comparison to a monkey.

## V.   TRUONG LIED TO MANAGEMENT AND EMPLOYEE RELATIONS ON FEBRUARY 21 AND 22, 2023 REGARDING WHY HE CALLED ██████ A "MONKEY"

On February 21, 2023, when DiGaetano first spoke to Truong about his conduct, she told

him that his conduct was not appropriate and was explicit regarding the racially discriminatory

nature of his use of the word "monkey."  Truong's response was defensive, rather than taking

responsibility, and, after DiGaetano also informed him that she would document their

conversation with a Note to File, Truong appeared more interested in the Note to File than the

---

(noting: "Charlie says we joke around" and "Charlie did not apologize"), and with ██████'s witness statement, *see* JX 9 (providing: "First thing to solve a problem is recognizing that there is one.  Ignorance is not an excuse and not only an apology were made but more learning from each other and training").  While much was made of the grammar and syntax of his written statement, when read in context, it is clear that the reference to an apology—as well as to "learning from each other and training"—is to a potential future action that has not yet occurred. Furthermore, at the hearing, ██████ clearly explained that, when he wrote the sentence, he was not intending to indicate that there had been an apology because there was no apology.

305610136v.9

**REDACTED**

wrongfulness of his conduct.  *See* CX 6 (Note to File).  After this conversation in the hallway, Truong approached DiGaetano at her desk and tried to claim that he said, "monkeys like bananas" or "monkeys eat bananas," to which DiGaetano said that that was not what she heard. DiGaetano reiterated what she heard, at which point Truong admitted, "I guess I said it then."

A day later, on February 22, 2023, Employee Relations confronted Truong about his conduct.  Truong claimed that he did not know that it was racist to call a Black man a "monkey" and, for the first time, claimed that it was a reference to the Chinese Zodiac.  *See* JX 7.  It is undisputed that ███ was <u>not</u> born in the Year of the Monkey and that Truong had no reason to believe that ███ was.[5]  Furthermore, at no time during either conversation with DiGaetano on February 21, 2023, did Truong make reference to the Chinese Zodiac, nor had DiGaetano heard Truong refer to colleagues by their Chinese Zodiac sign.  Similarly, ███ had not previously heard Truong refer to him by his Chinese Zodiac sign.

## VI.   EMPLOYEE RELATIONS INVESTIGATES AND TERMINATES TRUONG'S EMPLOYMENT

On February 22, 2023, Gobovets referred the matter to Employee Relations.[6]  On that same day, Employee Relations made the decision to place Truong on a Suspension Pending Investigation.  Employee Relations conducted the investigation, which included witness interviews and gathering witness statements.  *See* CX 8 and CX 9 (Employee Relations Case Summary).  At the conclusion of the investigation, Employee Relations documented the basis for Encore's decision to terminate Truong for violating Encore's Preventing Discrimination and Harassment policy.  *See* CX 10.  Truong's termination was effective March 17, 2023.  *See* JX 9.

---

[5] In fact, ███ was born in 1983, the Year of the Rat.  Moreover, Truong was well aware of which year was the Year of the Monkey because he has provided pictures and testimony showing that his wife was born in the Year of the Monkey.

[6] Neither DiGaetano nor Gobovets were responsible for the decision to suspend Truong, nor was either manager tasked with investigating the policy violation or determining the appropriate discipline.

**REDACTED**

## ISSUE

Did Encore have just cause to terminate the Grievant?  If not, what shall be the remedy?

## ARGUMENT

### I.   ENCORE HAD JUST CAUSE TO TERMINATE THE GRIEVANT

There is no dispute that Truong referred to ███ as a "monkey," a dehumanizing characterization with deep roots in racism against Black people; and that he did so in the workplace, in front of other colleagues, and in the context of questioning ███'s integrity vis-à-vis honoring a debt.  There is also no dispute that Truong later singled out ███ when he offered ███ a bunch of bananas immediately after being suspended for calling ███ a "monkey."  Truong's conduct was objectively harassment and discrimination, as defined by the CBA and Encore policy, and subjectively upsetting to at the very least ███ and DiGaetano. Encore, therefore, had just cause to terminate, and the grievance must be denied.

As a preliminary matter, Encore need only prove that Truong's conduct violated the harassment policy to establish just cause for his termination.  The parties' agreement provides that Encore shall have zero tolerance for conduct of this type; thus, upon reaching the conclusion that Truong used a racist slur (which he indisputably did), Encore was justified in immediately terminating Truong.  Put another way, as Article 20 of the CBA provides that the arbitrator is bound by its terms and may not modify them and given that Truong's use of a racist slur violated the prohibition against harassment, the arbitrator is bound to uphold the termination pursuant to the strict regulation of workplace harassment in Article 28 of the Agreement rather than fashion her own remedy.[7]  Article 28 reflected the parties' express agreement that there would be zero

---

[7] See *Poland Spring Corp. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC, Local* 1445, 314 F.3d 29, 34 (1st Cir. 2002) (vacating arbitration award reinstating an insubordinate employee because the employer and the union had agreed in the collective bargaining agreement that insubordination warranted termination); *see also Georgia-Pacific Corp. v. Local 27, United Paperworkers Int'l Union*, 864 F.2d 940, 941 (1st Cir. 1988)

305610136v.9

**REDACTED**

tolerance of harassment in the workplace.  The Union's argument that termination was too harsh is contrary to the language of the parties' agreement.  Furthermore, Article 28 recognizes that because harassment will not be tolerated, the parties agreed Encore could impose immediate termination; it need not apply progressive discipline.

Truong's conduct was in violation of the prohibition against race-based harassment and discrimination as set forth in the Agreement, and applicable Encore policies, which defines harassment as including abusive language.  Based on his violation, Encore was justified in terminating his employment.  *See Albertson's*, 117 LA 39, 46 (Kaufman, 2002) (where credible violations of the anti-harassment policy were established, it was not unreasonable for employer to choose to "enforce a policy of zero tolerance in this regard.").  Moreover, arbitrators have routinely upheld discharges where there has been a clear violation of Company policy, like here. *See ABM Gov't Services*, 138 LA 897 (Jennings, 2018) (upholding discharge decision where evidence demonstrated clear violation of company work rules); *see also Kuka Toledo Prod. Operations*, 138 LA 1241 (Belkin, 2018) ("Under the circumstances, due to the clear and convincing evidence of [Grievant]'s work rule violations, there is no basis to overrule managerial discretion in regard to the discharge penalty.  It is therefore determined that there was just cause for discharge.").  Furthermore, here, for the arbitrator to act otherwise is contrary to public policy given that throughout the United States, and in Massachusetts in particular, there is a dominant and well-defined public policy against race-based discrimination and harassment in the workplace and in favor of preventing discrimination and harassment.[8]  Permitting Truong to

---

(vacating arbitration award where "arbitrator exceeded the authority granted to him by the parties" and noting "if we accepted the Union's argument [that the just cause inquiry still applies], we are unable to see any reason why the list of offenses sanctionable by immediate discharge was included in the language of the agreement").

[8] What's more, any outcome other than upholding Truong's termination would be even more troubling, and even further out of step with public policy, in light of the oversight to which Encore must submit in order to maintain its gaming license in Massachusetts.  The Massachusetts Gaming Commission requires Encore to select and maintain

**REDACTED**

return to work would be tantamount to condoning discrimination and harassment in the workplace.

Moreover, while the conduct need not rise to the level of violating state or federal law to violate the prohibition against harassment and discrimination set forth in the CBA and Encore's policies, notably both the courts and the EEOC have made clear that referring to a Black person as a "monkey" in the workplace is a form of racial denigration that can, and has, formed the basis of discrimination and harassment claims. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."); *Renfroe v. IAC Greencastle, LLC*, 385 F. Supp. 3d 692, 704 (S.D. Ind. 2019) (Plaintiff's co-workers "use[d] [] some of the most extreme terms of racial degradation," including use of the word "monkey" to describe Plaintiff, who is Black); and *McLaughlin v. Nat'l Grid USA*, No. 07–40118–FDS, 2010 WL 1379814, 14 (D. Mass. Mar. 21, 2010) ("Although National Grid contends that the gorilla had absolutely nothing to do with race, it would not necessarily be unreasonable for a jury to conclude otherwise.") (citing *Jordan v. Alternative Resources Corp.*, 458 F. 332, 350 (4th Cir. 2006) ("It is plain that a reference to our African–American fellow citizens as 'monkeys' reflects the speaker's deep hostility towards them on the sole basis of their color.")); s*ee also Significant EEOC Race/Color Cases (Covering Private and Federal Sectors)* (available online at: https://www.eeoc.gov/initiatives/e-

---

an outside, independent monitor that is closely involved in monitoring Encore's Massachusetts operations to ensure that Encore is in compliance with its policies generally, and its Preventing Harassment and Discrimination policy in particular. *See* Mass. Gaming Commission Seeking Independent Monitor for Encore Boston Harbor, MASSLIVE, available at https://www.masslive.com/casinos/2019/05/mass-gaming-commission-seeking-independent-monitor-for-encore-boston-harbor.html.

305610136v.9

**REDACTED**

race/significant-eeoc-racecolor-casescovering-private-and-federal-sectors) (listing several matters in which the word "monkey" was among the racial slurs giving rise to liability).

At bottom, Encore and the Union agreed that harassment and discrimination were intolerable elements of the work environment.  Truong's termination reflects Encore's commitment to that agreement.

## II.      TRUONG IS NOT CREDIBLE

Truong gave a series of inconsistent statements and incredible excuses for his conduct. Truong's shifting stories so fundamentally undermine his credibility that his testimony merits little to no weight.

When first approached, Truong offered no explanation, excuse, or denial for his conduct, instead he focused on his Note to File; completely failing to take responsibility for the wrongfulness of his conduct.  Then, perhaps thinking he had an opportunity to avoid any consequence, and maybe not realizing that DiGaetano herself had heard his racist slur, Truong had the gall to claim that he had said something along the lines of "monkeys like bananas."  Not only a lie, but an absolutely non-sensical claim as there is no context in which that would have been a reasonable or relevant statement in the workplace.

Once he had a night to sleep on it, enough time to concoct what he clearly hoped would be a more convincing story, Truong claimed that his racist slur was a reference to the Chinese Zodiac.  This was again nonsense.  There was no evidence that Truong has ever referred to ███████ or others in the workplace, by their Chinese Zodiac sign.  And, in any case, ███████ was born in the Year of the Rat, and Trung had no reason to believe he was born in the Year of the Monkey.

14

**REDACTED**

Finally, with months to prepare, Truong settled on yet another story for the hearing, which was equally lacking in credibility.  Truong backed away from his Chinese Zodiac excuse and instead said that he calls everyone a "monkey" and that it is a joyful term in his culture; one you might use with your children, for example.  There was no evidence Truong had a practice of calling ███████ or anyone else in the workplace, a monkey.  Here, rather than a "joyful" term, Truong used the word "monkey" to denigrate a Black man in the context of suggesting that he might renege on a wager.

Truong presented an equally implausible explanation for having singled out ██████ with a bunch of bananas: claiming that he did not like to waste food (although he threw them away without offering the bananas to anyone else in the busy room) and that ██████ liked snacks (which could certainly be said about more than one of their colleagues).  Notably, when first asked about this incident at the hearing, prior to watching the video, Truong referred to offering ██████ "vegetables."  This again showed his willingness to obfuscate the truth when, in fact, Truong went out of his way to offer only ██████ bananas in a brazen act of disrespect for ██████ and the gravity of his misconduct.  This doubling down on the dehumanizing comparison of ██████ to a monkey flies in the face of any claim by Truong that he was genuinely remorseful for his conduct, further undermining the credibility of his testimony at the hearing.

Among the least credible claims he made is to aver that he did not understand that calling a Black colleague a "monkey" was a racist slur.  It is simply not credible that Truong—who was born in 1979, has lived most of his life in the greater Boston area, and attended Malden High School—was ignorant of the racially discriminatory nature of calling a Black man a "monkey."  Even if one were to be inclined to believe Truong came to his employment at Encore unaware of the racist implication of calling a Black man a "monkey," despite the incredibility of the claim;

**REDACTED**

in his orientation Encore explicitly informed Truong that referring to a Black person as a "monkey" is offensive and used doing so as an example of harassment and discrimination. *See* CX 4 at 8.

At bottom, the only thing consistent about Truong's statements was his willingness at each turn to offer self-serving lies to avoid the just consequences of his actions.

## III. THE UNION'S ARGUMENTS AGAINST TERMINATION ARE WITHOUT MERIT

At the hearing, the Union seemed to condone Truong's conduct and to contend that some discipline less than termination was warranted. The Union's apparent arguments against termination, addressed in turn below, are meritless.

*Severity of The Conduct.* The Union appears to be arguing that, because his conduct could have been worse, some lesser discipline was warranted. This is not consistent with either the plain language or the spirit of the CBA, both of which support Encore's zero tolerance approach. By the Union's approach, it would seem, that the only racial slur that they concede warrants termination is the n-word[9] or that the conduct needs to reach the level of a clear violation of state or federal law before Encore can take appropriate remedial action, which is again inconsistent with the letter and spirt of the CBA. Here, reinstatement as part of any lesser sanction would (1) send the message to all employees that they can engage in harassment with impunity and suffer only minor discipline; (2) set the stage for perpetuating a hostile work environment; and (3) be repugnant to public policy.

*Truong's Performance History.* As the Union repeatedly noted, Truong received several commendations from the Call Center Management Team regarding his sales numbers. *See*

---

[9] During the hearing, Truong referred to the "m-word" in an apparent recognition that referring to a Black colleague as a monkey is as egregious as using the "n-word."

**REDACTED**

Union Exhibit ("UX") 3.  Truong's sales numbers are not relevant to this matter.  As Encore makes clear to all of its employees, the prohibition against discrimination and harassment applies to "any employee, volunteer, vendor, contractor, consultant, guest, customer, or visitor;" which means that everyone, up to and including the President and the highest spending customers, must comply.  *See* CX 4 at 3.  An employee who is a successful salesperson is not excused from compliance with the above referenced policies prohibiting discrimination and harassment, nor should they be held to a lesser standard.  If anything, when a high performing employee, with a relatively long tenure, directs a racial slur at a colleague and in the presence of several others, the negative impact of the conduct—or of the employer's inaction in response thereto—is amplified. Furthermore, were the arbitrator to be inclined to give the commendations any weight, which they do not merit, Encore notes that several appear to be greater than 12 months old from the date on which the grievance was filed and, therefore, may not be considered per the CBA.  *See* JX 1 at Article 17.

 ***DiGaetano's Brief Delay and Note to File.***  The Union sought to make much of the fact that DiGaetano did not act in the moment when she heard Truong use a racist slur.  As DiGaetano noted, she felt ill equipped in the moment to handle an upsetting scenario she had never previously before encountered, so she waited for her own manager to return to work two days later.  Once Gobovets was aware of Truong's conduct, she took the proper steps to bring this matter to Employee Relations.  *See* CX 2 at 5 (requiring that: "Any supervisor or above who becomes aware of possibly discriminatory, harassing, or retaliatory behavior **must immediately** report the situation to the Employee Relations Department, Legal Department, or Compliance") (emphasis in original).  Within a day of DiGaetano speaking to Gobovets: the matter was properly with Employee Relations, Truong was interviewed by Employee Relations, and Truong

was place on suspension pending investigation.  Furthermore, as they testified, it was not within the scope of either DiGaetano's or Gobovets's role or authority to investigate or disciple conduct of the type at issue here.  *See* CX 2 at 5.  That responsibility rested with Employee Relations, who handled the matter appropriately.  DiGaetano's Note to File, which merely documented DiGaetano's brief conversation with Truong,[10] was not discipline,[11] let alone final discipline on the merits.[12]  DiGaetano's brief delay did not harm Truong and, had DiGaetano carried out her responsibilities without the brief delay, that would not have changed this outcome.

 ***Accountability.***  To the extent it may be deemed relevant, Truong never took accountability for his conduct.  He persisted in offering excuses throughout and expressed remorse only once he experienced consequences of his conduct.  ▮ credibly testified that Truong never apologized.  To the extent that Truong may think that having told ▮ that he was joking, *see* CX 8, was an apology; he is mistaken as to what constitutes an apology.  That Truong appears to continue to believe that labeling his conduct "a joke"[13] excuses the conduct is demonstrative of a lack of accountability.

 ***Subjective Impact.***  The Union sought to portray ▮ as accepting Truong's conduct, to the point that ▮ expressed his frustration that people appeared to be putting words in his

---

[10] As Gobovets testified, the Note to File was to document the conversation between DiGaetano and Truong, not the outcome.

[11] The Union concedes this point.  As the Union argues and Truong testified, he did not have active discipline at the time of the termination decision.  Truong did, however, have several Notes to File in the preceding 12 months.  *See* CX 6.  A Note to File falls below the first step in Encore's Progressive Discipline process, which begins with a Level One Written Warning issued on a Counseling Notice form.  *See* CX 3.  Furthermore, a Note to File is not sent to the Union pursuant to Article 17, again because it is not a disciplinary action.  *See* JX 1 at Article 17.

[12] Given the clear and unequivocal language of Article 28 and Encore's Preventing Harassment and Discrimination policy, it would be patently absurd were the Union to posit that a Note to File—which is not a disciplinary action—would be the sum total response from Encore for an employee using a racist slur to refer to a colleague in the workplace.

[13] Encore further notes that it is not credible that Truong would think a "joke" is immune from consequence under the applicable discrimination and harassment policies because the employee orientation explicitly identifies "jokes" as forms of harassment and discrimination on three separate slides.  *See* CX 4 at 12, 17, and 25.

305610136v.9

mouth.  That ███████ who showed himself to be both even tempered and a consummate professional, did not have some performative emotional response does not change the facts of this matter: ██████ a Black man, was called a "monkey" by Truong; ██████ was offended; and ██████ recognized this offensive language never should have been used in the workplace.  The decision as to the appropriate discipline rests with the employer, here Encore, and is not a burden that should be shunted off to the victim of the inappropriate conduct.  Likewise, it is Encore, not ███████ that has the legal and contractual obligation to take preventative and remedial actions to create a workplace free from discrimination and harassment.  Here, in furtherance of those obligations, Encore made the correct decision to honor its commitment to not tolerate discrimination or harassment.

*Training.*  To the extent that the Union is arguing that Encore could do more training, as noted in the CBA, Encore is committed to training on these important topics.  That said, by any measure, this does not excuse, or even mitigate, Truong's conduct, particularly were the training Encore does provide <u>explicitly</u> highlights calling a Black person a "monkey" as an example of harassment and discrimination.

## <u>CONCLUSION</u>

For these reasons, the grievance should be denied.

305610136v.9

Dated: November 8, 2023                                   **ENCORE BOSTON HARBOR**

By its attorneys,

/s/ *Sarah B. Affel*
Robert A. Fisher (BBO # 643797)
Sarah B. Affel (BBO # 672651)
rfisher@seyfarth.com
saffel@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: (617) 946-4800

305610136v.9