# EXHIBIT B

Labor Relations Connection

In the Matter of the Arbitration          LRC # 240-23
                                          (Charles Truong Termination)

Between

Teamsters, Local 25

And

Encore Boston Harbor

## AWARD

The Employer did not have just cause to terminate the employment of the grievant, Charles Truong, on February 22, 2023.

The grievant's termination must be rescinded and replaced with a Level 2 written warning.

The grievant must be offered reinstatement to his former position of Reservation Agent and must be made whole for his lost wages and benefits from the date of his termination to the date of compliance with this Award.

The Arbitrator reserves jurisdiction over this matter for ninety days from the date of this Award and for the sole purpose of resolving any dispute between the parties concerning the remedy ordered herein.

Sarah Kerr Garraty, Arbitrator

December 11, 2023

Labor Relations Connection

In the Matter of the Arbitration                LRC # 240-23
                                                (Charles Truong Termination)

Between

Teamsters, Local 25

And

Encore Boston Harbor

## **AWARD**

Before:              Sarah Kerr Garraty, Esq.
                     Arbitrator

Appearances:         For the Union
                     Brian P. Senier, Esq.

                     For the Hotel
                     Robert A. Fischer, Esq.
                     Sarah B. Affel. Esq.

Hearing Dates:       September 7 and October 4, 2023

Briefs Received:     November 8, 2023

## **THE ISSUES**

The parties stipulated to the following statement of the issues:

Did the Employer have just cause to terminate the employment of the Grievant, Charles Truong, on February 22, 2023?

If not, what shall be the remedy?

## RELEVANT CONTRACT PROVISIONS

### Article 17 – Discipline and Discharge

Employees may be discharged, suspended, or disciplined by the Employer for just cause. The parties agree that the policy of progressive discipline in all cases where warranted, but egregious matters may result in suspension pending investigation (SPI) or termination with no prior discipline.

### Article 28 – Sexual Harassment and Workplace Violence

Harassment and workplace violence will not be tolerated. Individuals engaging in such conduct will be subject to discipline including immediate discharge. Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile working environment, workplace violence and sexual harassment….

## BACKGROUND

This case emanated from an interaction between two Reservations Agents - Grievant Charles Truong and his colleague, ▮▮▮▮▮▮▮▮. They worked in the Call Center Operations Department at the Encore Boston Harbor Hotel (Encore.)

The grievant had held this position since June of 2019 while ▮▮▮▮ was hired in March of 2022. By all descriptions, these two Reservations Agents were on friendly terms. Their jobs basically involved booking rooms; they sat in a row of cubicles and answered the calls that came in and booked reservations. They were the two most productive Reservationists in terms of rooms booked and revenue achieved. Indeed, Encore has a program titled "Race to the Millions" in which the highest achieving reservationist each month is rewarded with a prize, and one or the other of them generally won.

The grievant and ▇▇▇ also often made "friendly bets" among themselves in which the monthly winner would be rewarded by the other with cigarettes, rounds of alcoholic beverages, and the like. The two also exchanged "small talk" between calls. [1]

During a busy Saturday shift on February 18, 2023, there was some banter about the competition between the grievant and ▇▇▇ during which the grievant said, "the monkey better pay." [2] Because ▇▇▇ is black, that comment was unquestionably read as a racist remark to some of those that overheard it.

▇▇▇ testified that when the "monkey" comment was made "the room went quiet" and he just picked up his next call. He recalled no particular emotion; he explained, "that's what happened – I had two days off the next day, and I was in a good mood."

The grievant is of Vietnamese descent. He testified that he was unaware that referring to a black person as a monkey had racist connotations; in his culture calling someone a monkey is a term of affection and is often associated with the year of the monkey on the Vietnamese zodiac calendar.

On the grievant's next workday his immediate supervisor, Charlene Di Gaetani, called him out into the hall and told him that referring to ▇▇▇ as a monkey was a bad term and that he should know better. The grievant offered to apologize to ▇▇▇ and testified that he did so the following day. He recalled that no one else witnessed this apology. He reported that he told ▇▇▇ that he had not meant to say anything offensive and that he is not a racist.

---

[1] The cubbies are lined up in two rows facing each other. The grievant's station was in the same row as ▇▇▇ with two other reservationists located between them.

[2] Witnesses to this interaction recalled the grievant's words variously as "as long as the monkey pays me" and, "Oh, don't worry – the monkey's going to pay me."

4

He recalled that ▓▓▓ had reassured him that he had not complained about the comment; Charlene had approached him about it. ▓▓▓ testified that no apology occurred.

On February 22, 2023, the grievant was suspended pending investigation. The grievant wrote on the form documenting the suspension:

> I did not mean any hurt towards anybody this is involved. I'm sorry for saying that word. I did not know the word is a bad word. Again, I'm sorry this happen."

On the same day, Charlene DiGaetano also approached ▓▓▓ to ask whether ▓▓▓ had heard the monkey comment. He verified that he had, and DiGaetano told him that management would take necessary steps. She provided an email summary to management which read, in pertinent part:

> ... Charles (Charlie) Truong and ▓▓▓ ▓▓▓ were having their usual banter in regards to who would have the highest revenue for February 2023. For background, we have a Revenue Racetrack that we display so out Reservation Agents can see how much they are selling in Room Revenue. Charlie and ▓▓▓ usually go back and forth about who will be # 1 and Charlie always tries to get ▓▓▓ to place a bet. ▓▓▓ will typically shrug off anything Charlie says. On this particular day, I was at the Assistant Manager desk ... and I heard them going back and forth then ▓▓▓ got a call, and I overheard Charlie say, "As long as that monkey pays me" to Maria Portillo... I did not react to this right away, as I was unsure of how to handle this situation (it did not appear to offend anyone but me) ... Maria and I spoke and she confirmed she heard what he said, ▓▓▓ confirmed with me that he also heard what was said but did not take it in a negative way, but did not appreciate that it was said.
>
> I did not inform Yelena of this until Tuesday, February 21, 2023 ... I informed her that I would have a conversation with Charlie, and she directed me to add a Note to File... On February 21... I informed (Charlie) that discriminatory language of that nature is not appropriate and should not be said in the workplace. Charlie was told that there would be a Note to File...

That Note to File read:

> Spoke with Charlie about using discriminatory words at work. I overheard him on Saturday said to ▓▓▓ "As long as that monkey pays me." I spoke with ▓▓▓ today and he said he heard it too, but he does not let what Charlie says bother him in that manner. I informed Charlie that this would be a NTF (Note to File) and of course he is being very defensive and trying to say things to defend himself. I informed Charlie

5

that he just needs to not say things of that nature at work as it is highly inappropriate and offensive. Charlie is aware that another instance of this nature will result in ROC (Record of Conservation...)[3]

DiGoetano testified that she consulted about the incident with her manager, Yelina Gorbovets, who instructed her to place a note to file. [4]

After receiving the suspension pending investigation notice the grievant reentered his work area and started to clean out his desk area. He testified that he had some bananas from the cafeteria in his drawer. He picked them up with the intent of throwing them away but just before doing so he asked ▇▇▇▇ if he wanted them. ▇▇▇▇ declined without affect and the grievant threw the bananas in the trash.[5] The grievant testified that he did not want the bananas to rot in his drawer and is aware that ▇▇▇▇ is a "big snacker" who often has food at this station.

Call Center Manager Yelena Gorbovets testified that this was the first racial incident she has dealt with. She delegated the investigation to Charlotte Valentin Rivera and instructed her to place a "note to file" documenting the incident. She did not participate in the decision to terminate the grievant, although she did participate in ▇▇▇▇ and Maria's interviews.

---

[3] The employer introduced a document containing the notes to the grievant's file dating back to 2019. These contained both positive and negative entries. For example, On 1/3/22 there was a note that read, "Charlie was beyond helpful and such a wonderful help during out booking process. Thank you, Charles, for being patient, kind and understanding." On 11/10/21 DiGaetano noted that "Charles was observed texting on his cellphone."

[4] DiGaetano did acknowledge that the grievant has received many commendations and had a great reputation in his job. He booked an unusually high number of rooms. She also acknowledged that her written summary was inaccurate; the grievant had not directed the monkey comment to Maria.

[5] This interaction was caught on video tape and introduced into evidence. There was no audio available. No one in the area appeared to react to his offer.

On February 23 and 24 respectively, the Grievant and ▇▇▇ each provided a written statement. The grievant wrote, in pertinent part.

> Myself and ▇▇▇ are good working co-workers that joke around in the office. We are good friends in office, and we hang out after work before and talk and text over the phone from time to time. On February 19 me and ▇▇▇ was in office talking about a contest we have in the office every month. We are always joke around and have good banter talk. We are competitive towards each other to who will win. I recently inform part of our conversation I said the word monkey. In my culture for Vietnamese New Year. We use that year you were born and in Chinese Zodiac tell you what animal you are for the year you were born. I didn't mean anything by this or any discrimination. He was not mad. I personally apologize to him as soon as I found out it is a racism term towards him. Our relationship has not change. We are good friends towards this day.

▇▇▇ wrote, in pertinent part,

> In the call center office on 2/18/23, an open conversation were taking place between Charles and I about selling the most rooms amongst us, and we are both competitive at what we do. We placed a friendly bet and what was said to reference of payment was "The monkey better pay." It was a silence after the comment, and I remained professional in doing my job. Once I returned back to work on 2/21/23 it was brought to my attention from my manager Charlene that a few people in the office reported this to her and I confirmed that it was offensive and something that should have never been said and I wondered how someone can be so comfortable in say something so offensive … It was not only offensive to me but to others… Ignorance is not an excuse and not only apology were made but more learning from each other and training.

▇▇▇ testified that employees are taught about the policy on racial discrimination and that based on his background, he was aware that black people are historically profiled as monkeys. His reaction was professional in the workplace but if he had not been on the job he might have reacted in a different way. He acknowledged that the comment had been hurtful and insisted that the grievant had never apologized to him. ▇▇▇ described the later incident in which the grievant offered him bananas as "bad timing." He did state that he had never seen the grievant as a hateful or racist person in the past and that "people say things they don't mean."

7

The Third witness interviewed was Maria Portillo. She wrote that,

"… they both were going back and forth but at one point Charlie told ▮▮▮▮, "Monkeys will pay." He said this because they made a bet of who would win. I brought it to my manager because I wasn't sure if what I heard was correct…" [6]

At the end of the investigation Encore management concluded that the charge was substantiated. The report concluded that,

> The charged party had admitted to using the word "monkey" during the conversation and gave non-credible denials about what he meant by this term. Witnesses corroborated the substance and context of the conversation… Based on Encore's zero tolerance policy against discrimination and harassment, the grievant should be terminated.

> The termination notices also mentioned that "after being put on Suspension Pending Investigation Charged Party gave a banana to the Affected Person. Charged Party was terminated for violating the Preventing Discrimination and Harassment Policy.

## POSITIONS OF THE PARTIES
### The Employer

The Employer argues that the collective bargaining Agreement and Encore's policies explicitly prohibit discrimination and harassment; that further provide that harassment will not be tolerated. Among the descriptions of harassment in the Article 17 of the CBA are abusive language, conduct creating a hostile work environment.

Encore's "Preventing Harassment and Discrimination Policy, Code of Business Ethics and Personal Conduct Policy provides that,

---

[6] The Union introduced two very positive statements of support from coworkers who worked with the grievant and described him as "a responsible, kind hearted and diligent colleague who was a top seller and who values his coworkers and expresses how much he appreciates the team on a daily basis," The second of these colleagues wrote that he was "one of the top salesmen in the Call Center and such a great person to work with" Both coworkers ended with an appeal to bring the grievant back to work.

> People work together better, and are more productive, when they are treated respectfully and feel comfortable in the workplace… The Company does not tolerate sexual or other unlawful harassment or discrimination by any employee …

"Harassment" is defined as "Unwelcome conduct, as determined by the recipient of the harassing behavior, whether verbal, physical, or visual, that is based upon a person's protected characteristic." Moreover, the Code of Ethics provides that "employees who violate this policy will be subject to disciplinary action, up to and including termination of employment …"

Encore has reinforced these policies with Harassment and Discrimination training. The grievant admittedly attended that training. Significantly the training materials included examples of inappropriate behavior. One example was a tweet stating, "so the black kid gets to wear the H&M sweater with "Coolest monkey in the Jungle" … This is beyond disgusting…"

Finally, the Employer points out that the Progressive Discipline language of the CBA provides that "… The parties agree that the policy of progressive discipline shall be used in all cases where warranted but egregious matters may result in suspension pending investigation or termination with no progressive discipline."

The employer insists that the grievant's dehumanizing reference ▮▮▮ as a monkey was exacerbated by the context, in which he publicly doubted whether ▮▮▮ would make good if he lost the wager he had agreed to. This brought his honesty into question.

To make matters worse, the grievant did not apologize for his racist words, even though he had ample opportunity to do so. And in the immediate aftermath of being placed on administrative leave pending investigation for referring the ▮▮▮ as a monkey, he proceeded to offer him bananas from his desk.

The company asserts that it need only prove that the grievant violated the harassment policy to establish just cause for termination. The CBA calls for a "zero tolerance policy" and permits termination without progressive discipline for workplace harassment. The grievant's insistence that he had no idea that referring to his black coworker as a monkey was a racist comment is not credible. He may come from a culture in which "monkey" is not a pejorative description, but he has spent most of his life in the Boston area where the racist implications of calling a black man a monkey are well recognized. Moreover, the grievant had received specific training that would have alerted him that likening ▆▆▆▆ to a jungle animal was a particularly insulting reference. And remarkably, in the immediate aftermath of being placed on leave for this racial slur, the grievant offered ▆▆▆▆ bananas.

Significantly, the grievant never apologized to ▆▆▆▆, nor did he accept responsibility for his blunder. Instead, he minimized his comment and seemed more concerned with the consequences for him than for the impact on his victim.

For all of these reasons, the company requests that the arbitrator deny the grievance.

**The Union**

The Union initially concedes that the grievant's comment had racist connotations and amounted to a "terribly unfortunate transgression." The Union nevertheless argues that there was not just cause for Encore's extreme disciplinary reaction. The grievant insists that to him, calling someone a monkey is a normal statement. He did not initially understand that it is not a normal interaction when addressing a black person. This blunder must be viewed in context. The grievant and ▆▆▆▆ were friendly workplace friend who had a competition to achieve the most sales in each month. It is undisputed that humorous competitive banter

between them between sales calls was a regular event. There is no evidence at all that the grievant had previously targeted ▇▇▇.

The Union points out that ▇▇▇ did not complain about the comment at the time. He finished his shift and began what was, for him, his weekend. The subsequent "campaign of outrage" was initiated by DiGaetano. Yet she did not even alert her supervisor until the following week. ▇▇▇ reported that, "First thing to solve a problem is recognizing there is one." He wisely explained that "ignorance is not an excuse" and that what was needed was, "not only an apology but learning from each other and training."

The grievant's other coworkers advocated on his behalf. Alex Rodrigues testified that he was not only a top seller but also a colleague who was fun to work with and would never disrespect … another worker. Sandra Laurent, a black colleague, described the grievant as kindhearted and responsible, also and noted that she would never associate herself with anyone who she deemed to be racist.

The Union also maintains that the "banana incident" was wholly innocuous; as the video made clear, the grievant was poised to throw out two bananas from his desk and, as an afterthought, offered them to ▇▇▇ an admitted snacker. ▇▇▇ did not react negatively and testified that, at most, this was "bad timing."

The Union cites to the difficult time that the grievant has endured since his termination and the hardship this has been for his wife and children; if reinstated, he would be the last person likely to repeat his single, albeit hurtful slur.

The Union also insists that the Company was not bound to terminate this highly productive employee with no prior disciplinary record based on its "zero tolerance" policy. Encore did not tolerate the grievant's misconduct. It suspended him pending investigation,

11

interviewed witnesses, and concluded that the charge against him had been verified. But in Article 17 of the Agreement, Encore pledged that "progressive discipline shall be used in all cases …. But egregious matters may result in … termination with no prior discipline." The Union argues that the grievant's one-time slip up was inappropriate but not egregious. He should therefore be reinstated to his former position and make whole for his lost wages and benefits.

**DISCUSSION**

There are very few factual disputes in this case. In a nutshell, it turns on interrelated articles of the CBA and company policy. Article 17 both establishes that the employer must apply progressive discipline and carves out an exception for conduct that is "egregious." If the grievant's racially tainted utterance was not "egregious," Encore was bound begin at a lower level of the progressive discipline ladder, which it admittedly did not do.

Encore insists that standing alone, referring to a black colleague as a "monkey" is egregious misconduct because it amounts to harassment, which is defined in Article 28 of the CBA as "including, but is not limited to, abusive or threatening language, conduct creating a hostile working environment, workplace violence or sexual harassment" Another helpful interpretation source is found in Encore's "Preventing Harassment and Discrimination Policy," which defines harassment as "unwelcome conduct, as determinized by the recipient of the harassing behavior, whether verbal, physical, or visual, that is based upon a person's protected characteristic." The Policy provides that "employees who violate this policy will be subject to disciplinary action, <u>up to and including termination of employment.</u>

The employer emphasizes the mandate that some discipline be imposed. (The language used is "<u>will</u> be subject.") It also provides that termination termination as a

permissible outcome.  The Union counters that the overarching requirement of just cause and its twin – progressive discipline must always come into play.

Was the grievant's single racial slur unwelcome verbal conduct based upon ▇▇▇▇ protected characteristic?  Certainly, it was.  Was it "egregious?" In the context revealed by the evidence in this case - the answer is no.  And in reaching that conclusion, that context is critical.

The grievant and ▇▇▇▇ had been only friendly colleagues for more than a year. There is no evidence that the grievant had displayed any sign of racism in the context of that relationship – or in any other interaction with his coworkers [7]  It is not disputed that the two made friendly competitive wagers about who would be top salesperson each month, and that between calls, they engaged in regular banter about that competition.  The offensive comment was a one-time event that reads as highly inappropriate teasing but not taunting.

There is one factual dispute that warrants consideration.  The grievant testified that when he was told that he had made a highly inappropriate statement he immediately apologized.  ▇▇▇▇ insisted that this did not happen.  The grievant recalled that was he said was that he had not meant to say anything offensive and that he is not a racist.  This was more in the nature of self-defense than apology.   If the grievant viewed this as an apology, it is likely that ▇▇▇▇ reasonably did not take it as such.

The grievant insisted that he had no idea that "monkey" had any racial connotation.

---

[7] I note that Encore's workforce is markedly international and multiracial, and that this workgroup was no exception.  Indeed, the grievant is Vietnamese and so also belonged to a protected class.

13

He cited positive associations with that word, based on its placement among the Zodiac signs that are part of his culture, and he insisted that this word is a term of endearment in his world. The employer disbelieved that claim. After all, the grievant has lived in the United States for all or most of his life; he would have been exposed to such racist slurs and should have recognized, and avoided, this one. The employer also stressed that the materials used during a training reading explicitly mentioned the juxtaposition "monkey with black people."[8]

There is no way that an arbitrator, or anyone else, can know with precision why the grievant said what he said. We can note that the grievant was not angry and was seemingly trying to be funny.[9] And the word monkey (unlike others such as the "N" word) can be used in racially benign contexts such as "monkeying around," as meaning playful. Discriminatory associations and stereotypes are unfortunately common in our society and can therefore surface without meanspirited intent.

Regarding the incident in which the grievant offered ▬▬ two bananas, it seems that this read even to ▬▬ as unremarkable. The grievant was removing a perishable food item from his desk area because he had been suspended for an unknown period. He started to throw the bananas away but, knowing that ▬▬ often snacked at his desk, he paused to see if ▬▬ wanted them. The most ▬▬ had to say about that was that it was not good timing. The employer did not prove that this amounted to a second incident of harassment.

---

[8] The example referred to was part of a lengthy PowerPoint deck and read: "So the black kid gets to wear the H&M sweater with 'Coolest monkey in the Jungle' – this is beyond disgusting." This example does highlight a negative connection between a black person and a monkey, but in the absence of any testimony about what the trainer said about the quoted (and somewhat confusing) tweet or about when this training occurred it is difficult conclude that the grievant should have made a connection, remembered it, and avoided it.

14

The provision that Encore has most heavily relied on as amounting to a zero-tolerance policy is not a mandatory termination policy. The Agreement and policy required it to take its ethical standards very seriously and to impose an appropriate level of discipline. The employer adhered to its zero-tolerance policy because it did not tolerate what the grievant said. It imposed discipline as it's policy commands.

But the grievant's long-term excellent service beginning when Encore first opened, his previously clean disciplinary record, the lack of evidence that he had ever displayed any evidence of racism, and the context in which this racist slur surfaced, entitle him to an opportunity to learn from this single mistake. Should he fail remain professional and kind in the workplace or continue make jokes that are not jokes, more serious discipline will appropriately follow.

Based on the above conclusions, the grievant's termination must be rescinded and replaced with a Level 2 written warning. He must be offered reinstatement to his former position and made whole for his lost wages and benefits.

**AWARD**

The Employer did not have just cause to terminate the employment of the grievant, Charles Truong, on February 22, 2023.

The grievant's termination must be rescinded and replaced with a Level 2 written warning.

The grievant must be offered reinstatement to his former position of Reservation Agent and must be made whole for his lost wages and benefits from the date of his termination to the date of compliance with this Award.

The Arbitrator reserves jurisdiction over this matter for ninety days from the date of this Award and for the sole purpose of resolving any dispute between the parties concerning the remedy ordered herein.

Sarah Kerr Garraty, Arbitrator

December 11, 2023