**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| WYNN MA, LLC,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>THE INTERNATIONAL BROTHERHOOD<br>OF TEAMSTERS, LOCAL 25; and<br>UNITE HERE!, LOCAL 26<br><br>　　　　　Defendants. | Civil Action No. 1:24-cv-10067 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGEMENT ON THE PLEADINGS</u>

Arbitrator Sarah Kerr Garraty (the "Arbitrator") concluded that Charles Truong ("Truong") used a racial slur when he called a Black coworker a "monkey." *See* Dkt. 1-1 at 13 (the "Award"). As he was suspended pending investigation by Plaintiff Wynn MA, LLC, doing business as Encore Boston Harbor ("Encore"), Truong—in crowded office space—approached only the victim and offered him a bunch of bananas just days after calling him a "monkey." Encore terminated Truong for his conduct, and Defendants International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers, Local 25 ("Local 25") and UNITE HERE! Local 26 ("Local 26") (collectively, the "Union") grieved and took to arbitration his termination pursuant to the parties' collective bargaining agreement, *see* Dkt. 1-2 (the "Agreement").

At arbitration, Truong feigned ignorance as to whether calling a Black man a monkey was a racial slur. The Arbitrator rejected this claim, concluding that, based on the record evidence, Truong used the racial slur, and this was "unwelcome verbal conduct based upon a protected characteristic." Dkt. 1-1 at 13. The Arbitrator nonetheless characterized Truong's use of a racial slur as "highly inappropriate teasing but not taunting" and explained that "[d]iscriminatory associations and stereotypes are unfortunately common in our society and can

therefore surface without meanspirited intent." *Id*. at 13-14.  The Arbitrator then described the banana incident as "unremarkable." *Id*. at 14.  The Arbitrator reduced the termination to a written warning and ordered Encore to reinstate Truong with backpay.

The Arbitrator's apparent belief that an employee who calls a Black coworker a monkey should get his job back (with backpay), so long as he claims it was a joke—regardless of the fact that the victim characterized the racial slur as "hurtful" and "offensive"—does not draw its essence from the parties' collective bargaining agreement.  In Article 28 of the Agreement, the parties agreed that harassment in the workplace is not tolerated and that employees who "engag[e] in such conduct will be subject to discipline including immediate discharge." Dkt. 1-2 at 21.  This language meant that the Arbitrator did not have a free hand to reduce the termination to a written warning and was not permitted to substitute her judgment for that of Encore.

Further, Truong's reinstatement violates the established and dominant public policy against race-based harassment in the workplace and an employer's obligation under federal and state law to redress such conduct in the workplace.  Title VII of the Civil Rights Act of 1966 and Massachusetts General Laws ch. 151B provide that employees are entitled to a work environment free of race-based harassment, and that an employer has an obligation to investigate and to promptly and effectively remediate race-based harassment in the workplace.  Encore fulfilled this obligation by removing Truong from working alongside the coworker to whom he had made the unwelcome racist comment.  By ordering his reinstatement, the Award violates public policy, as set forth by state and federal anti-discrimination law, and its terms would paradoxically force Encore to subject the Black coworker to whom Truong referred as a "monkey," and other coworkers who heard the racial slur and were upset by it, to continue working alongside Truong.

Accordingly, the Arbitrator's award should be vacated.  Further, as described below, the Court can decide this case on the pleadings pursuant to Rule 12(c).

I.      **THE COLLECTIVE BARGAINING AGREEMENT AND ENCORE POLICIES**

      A.      **The Collective Bargaining Agreement**

The Union is the exclusive bargaining representative of certain employees at Encore.  *See* Dkt. 1-2, p. 1.  Encore and the Union were parties to the collective bargaining agreement from April 19, 2021 until April 18, 2023. *See* Dkt. 1-2.  *See also* Dkt. 1 at ¶¶ 10-16, Dkt. 13 at ¶¶ 10-16, and Dkt. 14 at ¶¶ 10-16.

Article 17 of the Agreement is the general provision governing discipline and discharge.  *See* Dkt. 1-2 at 14.  It states that "[e]mployees may be discharged, suspended or disciplined by the Employer for just cause.  The parties agree that the policy of progressive discipline shall be used in all cases where warranted but egregious matters may result in suspension pending investigation (SPI) or termination with no prior discipline." *Id*.

However, the parties separately and specifically addressed discrimination in the workplace in two separate articles.  Article 27 states in relevant part:

> The Employer and the Union agree that there shall be no discrimination as to wages, hours or working conditions against any employee on account of race, color, creed, national origin, disability, religion, veteran status, sex, sexual orientation, union status or activity, age or any protected status as provided by law.

*Id.* at 21, Article 27. Further, Article 28 states in relevant part:

> Harassment . . . will not be tolerated.  Individuals engaging in such conduct will be subject to discipline including immediate discharge.  Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile work environment, workplace violence and sexual harassment.

*Id*. at Article 28.

Finally, Article 20 sets out the grievance process, culminating in arbitration of disputes

by a neutral arbitrator.  The Agreement states "[t]he arbitrator shall be bound by the terms of this Collective Bargaining Agreement and shall have no right to in any way to modify or revise it." *Id.* at 17.

### B. Encore's Preventing Harassment And Discrimination Policy, Code Of Business Conduct, And Personal Conduct Policy

Article 18 of the Agreement provides that Encore may establish and administer reasonable rules governing employee conduct.  *Id.* at 15.  Several such policies are at issue in this case.

First, Encore's Preventing Harassment and Discrimination Policy is applicable to all employees.  *See* Dkt. 1-3 ("Preventing Harassment Policy").  *See also* Dkt. 1 at ¶¶ 18-19, Dkt. 13 at ¶¶ 18-19, and Dkt. 14 at ¶¶ 18-19.  In relevant part, the policy provides:

> People work together better, and are more productive, when they are treated respectfully and feel comfortable in the workplace.  Harassment and discrimination are unacceptable.  We are committed to creating a respectful, courteous work environment free of unlawful discrimination and harassment of any kind.  The Company does not tolerate sexual or other unlawful harassment or discrimination by any employee, volunteer, vendor, contractor, consultant, agent, guest, customer, or visitor.  Harassment and discrimination are breaches of Company policy, and may be violations of state and/or federal law.  In addition to any disciplinary action that the Company may take, up to and including termination, offenders may also be personally liable for any legal and monetary damages.

*See Dkt.* 1-3 at 1.  The policy defines "harassment" as "unwelcome conduct, as determined by the recipient of the harassing behavior, whether verbal, physical or visual, that is based upon a person's Protected Characteristic."  *Id.* at 2.

Moreover, Encore maintains a Code of Business Conduct and Ethics, which Truong received and signed on May 29, 2019.  *See* Dkt. 1-4 ("Code of Business Conduct").  *See also* Dkt. 1 at ¶¶ 20-21, Dkt. 13 at ¶¶ 20-21, and Dkt. 14 at ¶¶ 20-21.  The Code of Business Conduct provides: "The Company does not tolerate offensive, demeaning, insulting or otherwise

4

derogatory conduct, and is committed to a workplace that is free from sexual harassment and harassment based on other legally protected characteristics, or any other basis protected by federal, state or local law or ordinance or regulation." *See* Dkt. 1-4 at 5. With respect to the prohibition against harassment and discrimination, the Code of Business Conduct further provides:

> Employees who violate this policy will be subject to disciplinary action, up to and including termination of employment. Disciplinary action can be taken in cases of inappropriate conduct, even if that conduct does not amount to a violation of the law.

*Id*.

Encore also maintains a Personal Conduct Policy applicable to all employees. *See* Dkt. 1-5 ("Personal Conduct Policy"). *See also* Dkt. 1 at ⁋ 22, Dkt. 13 at ⁋ 22, and Dkt. 14 at ⁋ 22. In relevant part, the policy provides that "personal conduct standards are based on the philosophy that people should be treated with dignity and respect." *See* Dkt. 1-5 at 1. Examples of expected conduct set forth in the policy include: "Creating a positive work environment by respecting, helping, and encouraging coworkers;" and "Refraining from inappropriate conduct," with a reference to the Preventing Harassment and Discrimination Policy setting forth additional detail with respect to appropriate workplace behavior. *Id.*

### C.     Encore's Preventing Harassment And Discrimination Training

Encore requires employees to attend, and Truong did attend, the Preventing Harassment and Discrimination orientation training. The training sets forth Encore's prohibition against discrimination, harassment, and retaliation and trains employees on "[h]ow to avoid these behaviors and foster a culture of respect and dignity." *See* Dkt. 1-6 ("Preventing Harassment and Discrimination Training"). *See also* Dkt. 1 at ⁋ 23, Dkt. 13 at ⁋ 23, and Dkt. 14 at ⁋ 23. The training explicitly provides that referring to a Black person as a "monkey" is offensive and is an example of harassment and discrimination. *See* Dkt. 1-6 at 8.

## II.      TRUONG'S RACIST CONDUCT

The following facts are taken from the Award.  *See* Dkt. 1-1.  *See also* Dkt. 1 at ⁋ 42, Dkt. 13 at ⁋ 42, and Dkt. 14 at ⁋ 42.  Encore employed Truong as a Room Reservation Agent in the Call Center.  *See* Dkt. 1-1 at 3.  He and his coworkers sat in a row of cubicles; they were responsible for booking reservations.  *Id.*  Truong and another employee, who is Black, often made informal bets regarding which of them would book more rooms in a month.  *Id.* at 3-4.  In connection with one of these bets, on February 18, 2023, while at his workstation, Truong said, in direct reference to and in the presence of this Black coworker: "The monkey better pay."[1]  *Id.* at 4.

Truong's statement was heard by at least two other Encore employees, including Charlene DiGaetano ("DiGaetano"), Truong's direct supervisor.  *Id.* at 4-5.  And, as the Arbitrator found, "[b]ecause [the victim] is black, [the] comment was unquestionably read as a racist remark to some of those that overheard it."  *Id.* at 4.  Quoting from the testimony of the victim, the Arbitrator wrote, "when the 'monkey' comment was made 'the room went quiet' and [the victim] just picked up his next call," *see id.* at 4, and his "reaction was professional in the workplace but if he had not been on the job he might have reacted in a different way."  *See id.* at 7.

On February 21, 2023, DiGaetano approached Truong about his having referred to his Black coworker as a "monkey."  *Id.* at 4.  She told him that referring to his coworker as a monkey was a bad term and he should know better.  *Id.* at 4.  At the direction of her supervisor, Yelena Gorbovets, DiGaetano placed a note in Truong's personnel file documenting this conversation.  *Id.* at 5.  *See also* Dkt 1-7 ("Note to File").  DiGaetano also spoke with the victim

---

[1] The Award notes: "Witnesses to the interaction recalled the grievant's words variously as 'as long as the monkey pays me' and 'Oh, don't worry – the monkey's going to pay me'."  *Id.* at 4, n.3.

who confirmed that he heard Truong refer to him as a "monkey."  *See* Dkt. 1-1 at 5.[2]

At the hearing, Truong claimed that he had apologized to the victim for the comment, but the victim denied that any such apology had occurred.  *Id.* at 4, 7.  However, the Arbitrator explained that Truong's purported statement "that he had not meant to say anything offensive and that he is not a racist" was not an apology and the victim would not have reasonably taken it as such.  *Id.* at 13.

On February 22, 2023, Encore placed Truong on a Suspension Pending Investigation.  *Id.* at 5.  *See also* Dkt. 1-8 ("Suspension Pending Investigation").  After being informed of the suspension, Truong offered his Black coworker, who he had just called a "monkey," a bunch of bananas that were in Truong's desk drawer.  *See* Dkt. 1-1 at 6.  Surveillance video, presented at the arbitration hearing, showed that Truong offered the bananas exclusively to the victim, although others were present, and threw the bananas away when the victim declined.  *Id* at 6.  *See also* Dkt. 1-16 ("Still Photographs").

On February 22, 2023, Encore's Employee Relations employee Charlotte Valentin Rivera initiated an investigation into the incidents.  *See* Dkt. 1-1 at 6.  During the investigation, Encore gathered witness statements, including from Truong, Maria Portillo, Truong's Black coworker, and Charlene DiGaetano.  *Id.* at 5, 7.  *See also* Dkts. 1-9 ("Truong Statement"), 1-10 ("Portillo Statement"), 1-11 ("Victim Statement"), and 1-12 ("DiGaetano Statement").  In his written statement, the victim stated that Truong's conduct "was offensive and something that should have never been said."  *See* Dkts. 1-1 at 7, 1-11 at 1.  The victim further noted Truong's conduct was "not only offensive to me but to others."  *Id.*  At the hearing, the victim "acknowledged that the comment had been hurtful."  *See* Dkt. 1-1 at 7.  After the investigation, Encore reduced to writing the conclusion of the investigation and basis for the Employee Relations Department's

---

[2] Truong's Black coworker had scheduled days off on February 19 and 20, 2023.  *Id.* at 4.

recommendation that Truong be terminated. *See* Dkt. 1-1 at 8. *See also* Dkt. 1-13 ("Encore Termination Reasons"). Truong was terminated on March 17, 2023. Encore Employee Relations prepared "synopsis notes" after the investigation, which provide:

> Employee Relations conducted an investigation that substantiated the allegation. Charged Party admitted to using the word "monkey" during the conversation and gave non-credible denials about what he meant by the term. Witnesses corroborated the substance and context of the conversation. After being put on Suspension Pending Investigation Charged Party gave a banana to Affected Person. Charged Party was terminated for violating the Preventing Discrimination and Harassment Policy.

*See* Dkt. 1-14 at pp. 3-4. ("Encore Relations Case Summary").

## III.   THE ARBITRATOR'S AWARD

The Union grieved Truong's termination and ultimately took the grievance to arbitration before an arbitrator. *See* Dkt. 1-1 at 2. A hearing was held before the Arbitrator on September 7 and October 4, 2023. *Id.* Twenty-three exhibits were introduced into evidence at the hearing, including the exhibits at Dkt. 1-2 through 1-14, and the Arbitrator viewed the surveillance video of Truong offering his Black coworker bananas, *see* Dkt 1-1 at 6. On December 11, 2023, the Arbitrator issued the Award. *Id.*

Although Truong tried to claim that he was unaware that calling a Black person a "monkey" was a racist slur and that, in his Vietnamese culture, "monkey" was a term of affection and associated with the year of the monkey on the Chinese Zodiac, the Arbitrator rejected those explanations. *Id.* at 4, 14. The Arbitrator concluded that Truong's use of the word "monkey" was a "racial slur" and constituted "unwelcome verbal conduct based upon [the victim's] protected characteristic." *Id.* at 13. The Arbitrator further found that the comment was "unquestionably read as a racist remark to some of those who overheard it." *Id.* at 4. However, the Arbitrator wrote that "[t]here is no way that an arbitrator, or anyone else, can know with precision why the grievant said what he said," but she believed that Truong "was seemingly

trying to be funny" and characterized the racial slur "as highly inappropriate teasing but not taunting." *Id.* at 13-14. The Arbitrator also wrote, "[d]iscriminatory associations and stereotypes are unfortunately common in our society and can therefore surface without meanspirited intent." *Id.* at 14. Apparently because she viewed Truong as making a joke, she concluded that it was not egregious and believed that termination was too harsh. *Id.* at 13, 15. As to the incident in which Truong tried to hand bananas to his Black coworker immediately after being suspended for calling him a "monkey," the Arbitrator characterized it as "unremarkable" and held that this did not constitute harassment. *Id.* at 14.

Although Encore specifically argued to the Arbitrator that the plain language of Article 28—providing: "such conduct will be subject to discipline including immediate discharge"—permitted Encore to terminate Truong for his misconduct, *see* Dkt. 1-15 ("Encore Boston Harbor's Post-Hearing Brief"), the Arbitrator disregarded Article 28 and claimed that under Article 17, only "egregious" incidents warranted termination. *See* Dkt. 1-1 at 12.

The Arbitrator reduced the termination to a written warning (Level 2) and ordered Encore to reinstate Truong to his former position with backpay. *Id.* at 1.

## LEGAL ARGUMENTS

While Encore acknowledges that review of an arbitrator's award is limited, where, as here, the award contravenes the clear language of the agreement and violates public policy, it must be vacated.

First, the Arbitrator's Award does not draw its essence from the parties' collective bargaining agreement. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960);[3] *Axia Netmedia Corp. v. Massachusetts Tech. Park Corp.*,, 973 F.3d 133, 141

---

[3] Unlike in other contexts where parties voluntarily choose to arbitrate a dispute, the Supreme Court has mandated that arbitration of disputes is required in the labor context as the *quid pro quo* for a union

(1st Cir. 2020).  The Arbitrator relied on Article 17 for the proposition that only "egregious" conduct may warrant immediate termination, but in doing so, ignored Articles 27 and 28, in which the parties agreed to a different standard involving harassment and discrimination in the workplace.  Those articles gave Encore the right to terminate Truong, regardless of whether the Arbitrator believed his conduct was egregious or not.

Second, the Award should be vacated because it violates the dominant and well-defined public policy against discrimination and harassment in the workplace.  *See Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1441 (3d Cir. 1992).  In ordering reinstatement, the Arbitrator apparently believed that employees are free to use racial slurs at least once at work, provided they do so in a joking manner, because race discrimination still exists in society.  But not only did the parties' Agreement say otherwise, Title VII and Massachusetts General Laws reject it.  As the Massachusetts Appeals Court explained, Chapter 151B does not give employees "one free racial slur."  *Augis Corp. v. Massachusetts Comm'n Against Discrimination*, 75 Mass. App. Ct. 398, 408 (2009) (holding liability was properly based on a single racial slur).  The Court explained that racial slurs have "no legitimate place in the working environment" and that a single offensive slur can constitute harassment under the law. *Id*. at 409.  The Arbitrator's reduction of the termination to a written warning and the order of reinstatement violates public policy and should be vacated.

## I.      The Award Is Contrary To The Parties' Agreement

The Award fails to draw its essence from the parties' agreement because the Arbitrator ignored specific language applicable to Truong's misconduct.  In reducing his termination to a

---

agreeing to not strike during the term of the labor agreement.  *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 455 (1957).  However, the Court explained that a labor arbitrator must follow the contract and cannot dispense their own brand of industrial justice.  *See United Steelworkers of Am v. Enter. Wheel & Car Corp.*, 363 U.S. at 597.

310847807v.12`

written warning, the Arbitrator wrongly believed that Encore was required under Article 17 to follow progressive discipline and not permitted to impose immediate discharge.  While Article 17 generally describes the parties' agreement regarding discipline and discharge, the parties addressed discrimination and harassment in the workplace separately and agreed to a different standard for such offenses in Articles 27 and 28.

Contrary to the Award, the parties bargained for and agreed that offenses relating to discrimination and harassment would *not* be subject to progressive discipline.  First, in Article 27, the parties agreed that there "shall be no discrimination" on the basis of race in the workplace.  Then in Article 28, the parties agreed that "[h]arassment . . . will not be tolerated" and that "[i]ndividuals engaging in such conduct will be subject to discipline including immediate discharge."  By its terms, the language did not include a requirement that Encore follow progressive discipline or that immediate termination was only permitted in egregious cases.  Had the parties intended for Article 17 to apply to offenses like that of Truong, the language in Article 28 would have been unnecessary.

There is no question that Truong's misconduct fell within the scope of Articles 27 and 28.  The Arbitrator expressly found that Truong's "racial slur [was] unwelcome verbal conduct based upon [the victim's] protected characteristic."  Article 28 prohibits abusive language and conduct that creates a hostile work environment and states that harassment generally will "not be tolerated."  Thus, Encore had the right under the collective bargaining agreement to impose "immediate discharge" for Truong's misconduct.

In nonetheless applying Article 17 to this case, the Arbitrator rendered Article 28's distinct language regarding offenses involving discrimination and harassment as surplusage.  But the contract required the Arbitrator to be bound by all terms of the Agreement and barred her

11

from modifying it. But by ignoring Article 28's language, she effectively wrote it out of the contract. The Arbitrator acknowledged its existence but then disregarded it by explaining that it did not mandate immediate termination. But this simply misses the point. Article 28 gave Encore the right to terminate Truong for his misconduct; Article 17 simply did not apply.

It is well-settled that courts cannot enforce an arbitration award that "does not draw its essence from the [collective bargaining] agreement." *Strathmore Paper Co. v. United Paperworkers Int'l Union AFL-CIO*, 900 F.2d 423, 427 (1st Cir. 1990) (citing *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.*, 363 U.S. at 597)). In *Enterprise Wheel and Car Corp.,* the final *Steelworkers Trilogy* case, the Supreme Court expounded upon its standard for review of an arbitration award:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. . . . *Nevertheless, an arbitrator is confined to interpretation and application of the collective bargain agreement; he does not sit to dispense his own brand of industrial justice.* He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, *courts have no choice but to refuse enforcement of the awards*.

363 U.S. at 597 (emphasis added); *see also Bacardi Corp. v. Congreso de Uniones Industriales de Puerto Rico*, 692 F.2d 210, 211 (1st Cir. 1982). Where, as here, an arbitration award demonstrates a manifest disregard of the collective bargaining agreement and is unsupported by principles of contract construction and industry practice, a court must vacate the award. *Hoteles Condado Beach v. Union De Tronquistas, Local 901*, 763 F.2d 34, 41 (1st Cir.1985) ("The arbitrator is, however, confined to the interpretation and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions.") (internal citation and quotation omitted). It is well-accepted that, although courts treat arbitration awards with deference, "a

12

court will not merely rubber stamp its approval." *Teamsters Local No. 25 v. Penn Transp. Corp.*, 359 F. Supp. 344, 348 (D. Mass. 1973).

In this respect, the Arbitrator's disregard of Article 28 is akin to the First Circuit's decision in *Poland Spring Corp. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC, Local* 1445, 314 F.3d 29, 34-35 (1st Cir. 2002), in which it vacated an arbitration award reinstating an employee guilty of insubordination. The arbitrator had concluded that the employee had committed the offense but believed that termination was too harsh. However, because the employer and the union had agreed in the collective bargaining agreement that insubordination warranted termination, the First Circuit held that "upon reaching the conclusion that [the grievant's] conduct was insubordinate, the arbitrator was barred from further inquiry because such additional probing constituted ignor[ing] the plain language of the contract." *Id*. at 34, *see also Georgia-Pacific Corp. v. Local 27, United Paperworkers Int'l Union*, 864 F.2d 940, 941 (1st Cir. 1988) (vacating arbitration award where "arbitrator exceeded the authority granted to him by the parties"). As in that case, upon concluding that Truong had uttered a racial slur constituting unwelcome conduct on the basis of a protected characteristic, the Arbitrator was required to uphold the termination pursuant to the strict regulation of workplace harassment in Article 28 of the Agreement rather than fashion her own remedy.

Article 28 recognizes that, because harassment will not be tolerated, the parties agreed Encore could impose immediate termination; it need not apply progressive discipline. This is similar to the language at issue in *Georgia-Pacific Corp.*, in which the parties agreed that the employer could impose immediate discharge for some offenses. *Id*. at 944-45. The First Circuit vacated the award of lesser discipline. *Id*. at 941. The union in that case argued that the arbitrator was free to reduce the termination. The First Circuit explained:

> We disagree. The language of the agreement is unequivocal in that it establishes two independent justifications for dismissal: 1) just cause and 2) a list of offenses, including dishonesty, for which immediate discharge is appropriate. . . . The language in this agreement is unambiguous that once dishonesty is established, no further showing is required.  In essence, dishonesty, as a ground for immediate discharge, is *per se* just cause.

864 F.2d at 944-45.  Similarly, here, the language of Article 28 must be read as allowing Encore to decide whether immediate termination is warranted, and once it established that Truong engaged in harassment in violation of Article 28, the Arbitrator was bound to uphold the termination.  She was not allowed to second-guess Encore's determination that Truong's conduct warranted termination.  Any other reading of Article 28 would render the "immediate discharge" language as surplusage.  *See id*. at 945 ("Moreover, if we accepted the Union's argument, we are unable to see any reason why the list of offenses sanctionable by immediate discharge was included in the language of the agreement").  *See also New England Carpenters Cent. Collection Agency v. Labonte Drywall Co.*, 795 F.3d 271, 282 (1st Cir. 2015) (rejecting argument that would render a clause of the agreement "superfluous and contravene the well-recognized 'canon of construction that every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible.'") (citing *FDIC v. Singh*, 977 F.2d 18, 22 (1st Cir. 1992); *Johnson Controls Sec. Sols., LLC v. Int'l Bhd. of Elec. Workers, Local 103*, 24 F.4th 87, 91-92 (1st Cir. 2022) (rejecting employer's reading of the agreement because it relied on an interpretation that rendered terms surplusage).

At bottom, Encore and the Union agreed that harassment and discrimiantion were intolerable in the the work environment and that immediate discharge is an approriate sanction, with no requirement for progresive discipline or any limitation on termination to "egregious matters."  Truong directed a racial slur at his Black coworker in their shared workspace, impacting the work environment for several employees who heard his racist remark, and was

terminated in accordance with the Agreement.

## II.     The Award Violates The Well-Established Public Policy Against Racist Conduct In The Workplace

The parties' insistence that "there shall be no discrimination" and that "[h]arassment will not be tolerated" was more than part of their agreement.  It was a recognition that there is a well-established and dominant public policy under the law against such conduct and requiring employers to take affirmative steps to remediate it.[4]   As the Award would require the reinstatement of an employee who directed a racial slur at his coworker, it should be vacated as violative of that public policy.

"As with any contract, [] a court may not enforce a collective bargaining agreement that is contrary to public policy."  *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.,*, 461 U.S. 757, 766 (1983).  To be sure, "[c]ourts may only vacate arbitration awards which explicitly conflict with well-defined, dominant public policy."  *Stroehmann,* 969 F.2d at 1441 (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 42 (1987).  Vacatur is warranted "where the contract as interpreted [by the arbitrator] would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *Boston Medical Center v. Service Employees Intern. Union, Local 285*, 260 F.3d 16, 23 (1st Cir. 2001) (internal citation and quotation omitted).  Accordingly, "if an arbitrator construes a collective bargaining agreement in a way that violates public policy, an award based on that construction may be vacated by a court."  *Stroehmann*, 969 F.2d at 1441.  Application of the public policy exception is a two-step

---

[4] As was Encore's Preventing Harassment and Discrimination Policy, which appropriately, broadly defines "harassment" as "unwelcome conduct, as determined by the recipient of the harassing behavior, whether verbal, physical or visual, that is based upon a person's Protected Characteristic."  *See* Dkt. 1-3 at 2.

analysis:

> The threshold question is whether a well-defined and dominant public policy can be identified. If so, the court must determine whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated the public policy.

*Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291-92 (3d Cir. 1996).  Both steps of the exception are met here.

First, throughout the United States, and in Massachusetts in particular, there is a dominant and well-defined public policy against race-based harassment and in favor of preventing offensive race-based conduct in the workplace.  Title VII of the Civil Rights Act of 1964 expressly prohibits harassment based upon race.  42 U.S.C.A. § 2000e–2(a)(1).  Similarly, Massachusetts General Laws ch. 151B, § 4 expressly prohibits discrimination based upon race.  Further, it is well settled public policy that an employer take responsibility to exercise reasonable care to promptly prevent and correct discriminatory behavior about which it is aware.  *See e.g. Chery v. Sears, Roebuck & Co.*, 98 F. Supp. 3d 179, 192 (D. Mass. 2015) (affirmative defense available to employers who prove "that the employer exercised reasonable care to prevent and correct promptly any [discriminatory] behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise") (quoting *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 261 (1st Cir. 2000).[5]

---

[5] What's more, any outcome other than upholding Truong's termination would be even more troubling, and even further out of step with public policy, in light of the oversight to which Encore must submit in order to maintain its gaming license in Massachusetts.  The Massachusetts Gaming Commission requires Encore to select and maintain an outside, independent monitor that is closely involved in monitoring Encore's Massachusetts operations to ensure that Encore is in compliance with its policies generally, and its Preventing Harassment and Discrimination policy in particular.  In addition, the outside, independent monitor is present for all meetings of Encore's Board of Directors, reviews bi-weekly logs of all of Encore's harassment cases, regularly sits in on Encore's weekly case reviews, and performs periodic focus group meetings with employees in each department to ensure that there is not unreported or uninvestigated harassment.  The purpose of the outside, independent monitor is, in part, to ensure that Encore takes seriously the issue of harassment on its property.  Thus, Encore goes to significant lengths to

310847807v.12`

Here, Truong used a well-known racial slur when he referred to his Black coworker as a "monkey" and did so in the workplace in the presence of other coworkers. While Truong claimed ignorance that the term was a slur, the Arbitrator rejected this claim. Both the courts and the EEOC have made clear that referring to a Black person as a "monkey" in the workplace is a form of racial denigration that can, and has, formed the basis of discrimination and harassment claims. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."); *Renfroe v. IAC Greencastle, LLC*, 385 F. Supp. 3d 692, 706 (S.D. Ind. 2019) (Plaintiff's coworkers "use[d] [] some of the most extreme terms of racial degradation," including use of the word "monkey" to describe Plaintiff, who is Black); and *McLaughlin v. Nat'l Grid USA*, No. 07–40118–FDS, 2010 WL 1379814, 14 (D. Mass. Mar. 21, 2010) ("Although National Grid contends that the gorilla had absolutely nothing to do with race, it would not necessarily be unreasonable for a jury to conclude otherwise.") (citing *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 350 (4th Cir. 2006) (King, J., dissenting) ("It is plain that a reference to our African-American fellow citizens as 'monkeys' reflects the speaker's deep hostility towards them on the sole basis of their color.")); s*ee also Significant EEOC Race/Color Cases (Covering Private and Federal Sectors)* (available online at: https://www.eeoc.gov/initiatives/e-race/significant-eeoc-racecolor-casescovering-private-and-federal-sectors) (listing several matters in which the word "monkey" was among the racial slurs giving rise to liability).

---

ensure that such harassment does not occur and to prevent employees from being exposed to harassment. The Award's mandate that Encore reinstate an employee who was found to have violated Encore's Preventing Harassment and Discrimination Policy is directly at odds with the Commission's mandate. *See* Mass. Gaming Commission Seeking Independent Monitor for Encore Boston Harbor, MASSLIVE, available at https://www.masslive.com/casinos/2019/05/mass-gaming-commission-seeking-independent-monitor-for-encore-boston-harbor.html.

Further, the law establishes that the utterance of a single racial slur can constitute a hostile work environment. *See Green v. Harvard Vanguard Med. Associates, Inc.*, 79 Mass. App. Ct. 1, 8 (2011) (finding liability for racial discrimination may be based on a single instance of a racial slur and noting "[t]he use of these disgusting, demeaning, and humiliating words, and the impact of their use upon those to whom they are directed, is a grave matter"); *Augis Corp.*, 75 Mass. App. Ct. at 408 (the law does not give employees "one free racial slur"). The historic and cultural context of racist language directed towards Black people is not abstract—it has tangible harmful impacts. An employer has an obligation to not only address a hostile work environment, but to prevent one from further developing by addressing conduct that foments such an environment. Indeed, in this matter, the subsequent incident involving bananas underscores the need for an employer's swift, decisive response to a single racist utterance.[6] To the extent the Arbitrator has concluded that context matters, it then should not go without noting that not only was Truong denigrating his Black coworker's humanity by referring to him as a monkey, he did so in the context of questioning whether his Black coworker would honor a debt, thereby leaning in to another racist trope.

The second step in the analysis is also met here, as the Award conflicts with this established public policy in multiple ways. The Arbitrator's order requiring Truong's reinstatement is tantamount to condoning discrimination and harassment in the workplace. It also inhibits Encore from taking reasonable steps to prevent and correct harassment in the workplace going forward.

Here, the Arbitrator's entire analysis waters down and ignores an employer's obligations

---

[6] The Arbitrator refused to consider the banana incident as harassment, but there is no dispute that it occurred as Truong was suspended for his use of a racial slur. The Arbitrator's attitude that this was "unremarkable" ignores the very context that the Arbitrator seemingly relied on—despite its lack of foundation in the Agreement or the law—given that this occurred after Truong's use of racial slur. *See* Dkt. 1-1 at 15.

under Title VII and Chapter 151B.  In ordering reinstatement, she inexplicably believed that "teasing" is somehow less harassing than "taunting" and that jokes do not amount to discrimination.  The notion that a racial slur made as a joke is excusable has no basis in the law.  *See Danco, Inc. v. Wal-Mart Stores, Inc.*, 178 F.3d 8, 16 (1st Cir. 1999) (plaintiff must show they were "exposed to comments, *jokes*, or acts of a racial nature" to establish a hostile work environment claim) (emphasis added).  Moreover, lest there have been any possible confusion on this point—either among Encore employees or the Arbitrator—Encore's Preventing Harassment and Discrimination Training explains that a "joke" can create a hostile work environment.  *See* Dkt. 1-6 at 26.  Further, Encore's Preventing Harassment and Discrimination Policy makes clear that "unwelcome conduct" is based on the determination of the recipient of the harassing behavior, thereby rendering the perpetrator's claim he was joking irrelevant to the analysis.  *See* Dkt. 1-3 at 2.  Finally, the evidence reflects that the victim did not consider the racial slur funny, rather he considered Truong's conduct "hurtful" and "offensive" and thought that the racial slur "should never have been said."  *See* Dkt. 1-1 at 7.

The Arbitrator's apparent belief that the prevalence of discrimination and stereotypes in society is a defense for Truong's conduct, and that therefore Encore's responsibilities as an employer are reduced, is simply mindboggling.  The suggestion that societal racism is a defense under Title VII or Chapter 151B flies in the face of employers' remedial obligation under these civil rights laws.  To the contrary, the public policy underlying workplace civil rights laws is to guard the door of the workplace against the intrusion of society's base tendencies towards racism, in order to create equal access to the workplace. *See Green*, 79 Mass. App. Ct. at 8 ("Among the purposes of our Commonwealth's antidiscrimination laws is the elimination from the workplace of this offensive and hurtful racial epithet—and of all others—and of the

discriminatory injury inhering in their use.").  Put otherwise, the existence of racism in the world says nothing about whether Encore must suffer such conduct in the workplace.

Finally, the law is clear that employees and employers do not get a "free pass" for a racial slur in the workplace.  *Augis* Corp., 75 Mass. App. Ct. at 408.  Yet, the Arbitrator's order of reinstatement directly contradicts this public policy.  If the Award is not vacated, Encore would be forced to return Truong to work alongside his Black coworker who he called a "monkey," as well as other employees who heard Truong's racist remark, and to chance that Truong would repeat the behavior.  Given that Truong never apologized for his conduct and instead offered the victim bananas and feigned ignorance as to whether he used a slur, this is not a chance Encore should be forced to take.

At bottom, the Arbitrator's blasé attitude towards Truong's use of a racial slur creates a fundamental and intractable conflict with the established and dominant public policy.  Her Award stands for the proposition that any worker at Encore may use a racial slur at work and suffer only a written warning, provided that the employee is convincing that they were just kidding.  The public policy behind Title VII and Chapter 151B demands more than this, and the order of reinstatement cannot stand.

## <u>CONCLUSION</u>

Encore respectfully requests that the Court grant its motion for judgment on the pleadings, vacate the award and grant such other and further relief as the Court deems just and proper.

310847807v.12`

DATED: June 3, 2024

Respectfully submitted,

WYNN MA, LLC

By Its Attorneys,


/s/ Robert A. Fisher
Robert A. Fisher (BBO #643797)
rfisher@seyfarth.com
Sarah B. Affel (BBO #672651)
saffel@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210-2028
Telephone:   (617) 946-4800
Facsimile:   (617) 946-4801

310847807v.12`

## <u>CERTIFICATE OF SERVICE</u>

I, Robert A. Fisher, hereby certify that on June 3, 2024, I caused a true and accurate copy of the foregoing document to be filed and uploaded to the CM/ECF system.

*/s/ Robert A. Fisher*

Robert A. Fisher

310847807v.12`